**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Carlos F.P.P.,

Petitioner,

v.

Todd Blanche, *Acting Attorney General, United States Department of Justice*; Markwayne Mullin, *Secretary, U.S. Department of Homeland Security*; and David Venturella, *Acting Director of Immigration and Customs Enforcement*,

Respondents.

Civ. No. 26-3123 (JWB/JFD)

**ORDER ON PETITION FOR WRIT OF HABEAS CORPUS**

---

Frances Ivy Mahoney-Mosedale, Esq., Gustafson Gluek PLLC, counsel for Petitioner.

David W. Fuller, Esq., and Derek Ganzhorn, Esq., United States Attorney's Office, counsel for Respondents.

---

This case presents two related questions: whether federal immigration officers acted within their statutory authority when they arrested Petitioner Carlos F.P.P. without a warrant, and, if not, whether 8 U.S.C. § 1225(b)(2) nevertheless supplies a lawful basis for his continued detention. The first question turns on whether the arresting officers complied with 8 U.S.C. § 1357(a)(2). The second requires consideration of the distinct functions Congress assigned to §§ 1357 and 1225 and the proper scope of habeas relief under § 2241.

Petitioner is a noncitizen who entered the United States without inspection and was released to the interior on his own recognizance. Years later, after he had been

ordered removed and filed an appeal, he was arrested and detained by Immigration and Customs Enforcement ("ICE") agents. At issue is whether his arrest was lawful.

The record establishes that Petitioner's warrantless arrest violated § 1357(a)(2). Whether that violation requires release despite Respondents' reliance on § 1225(b)(2) is a separate question. For the reasons explained below, the statutes are best read to preserve their distinct functions: § 1357 governs the authority exercised to arrest Petitioner without a warrant, while § 1225 governs detention following the examination and determination prescribed there. On that reading, Respondents may not continue the present custody initiated through an arrest procedure Congress did not authorize.

**BACKGROUND**

Petitioner is a citizen of Ecuador. (Doc. No. 1, Petition ¶¶ 2, 23; Doc. No. 7, Rott Decl. ¶ 8; Doc. No. 7-1 at 1–2.) He entered the United States without inspection in August 2022, was apprehended by Border Patrol agents, and was served a Notice to Appear charging him as being present in the country without admission or parole. (Petition ¶¶ 2, 23; Rott Decl. ¶¶ 9–10; Doc. No. 7-1 at 3; Doc. No. 7-3.) Petitioner was then released into the country on his own recognizance. (Petition ¶¶ 2, 23.)

Petitioner now lives in Minneapolis, possesses a valid work authorization, and works as a contractor for a roofing company in Spring Lake Park, Minnesota. (*Id.* ¶¶ 2, 24–25.) He has no criminal history and has followed all requirements throughout his removal proceeding. (*Id.* ¶¶ 2, 26; Doc. No. 7-3 at 4.) An Immigration Judge ordered him removed from the country in February 2026. (Rott Decl. ¶ 12; Doc. No. 7-1 at 3; Doc. No. 7-4.) Petitioner filed a timely appeal, which remains pending. (Rott Decl. ¶ 13; Doc.

No. 7-1 at 3.)

On June 25, 2026, Petitioner was working at a roofing job at the Pennington County Law Enforcement Center in Thief River Falls, Minnesota. (Petition ¶¶ 3, 27; Rott Decl. ¶ 14.) ICE agents arrived on site as part of a targeted operation to arrest a different individual from the Law Enforcement Center. (Petition ¶ 3; Rott Decl. ¶ 14; Doc. No. 7-1 at 2.) While securing the targeted subject, the agents observed "numerous subjects" climbing down a ladder from the roof of the Law Enforcement Center. (Rott Decl. ¶ 15; Doc. No. 7-1 at 2.) The agents did not make contact but saw the individuals "huddling together down the alley" and then they "rapidly climbed back up the ladder . . . and pulled their ladder up onto the roof with them." (Rott Decl. ¶ 16; Doc. No. 7-1 at 2.)

Based on that behavior, agents drove down the alley and discovered a roofing company box truck and a minivan parked where the roofers had initially climbed down. (Rott Decl. ¶ 17; Doc. No. 7-1 at 3.) A records check on the minivan's license plate revealed that the vehicle belonged to Petitioner, whom the agents also learned had been ordered removed to Ecuador. (Rott Decl. ¶ 18; Doc. No. 7-1 at 3.)

The agents sought permission to access the roof, and while doing so they observed "several subjects making attempts to conceal themselves while looking over the edge of the roof." (Rott Decl. ¶ 19; Doc. No. 7-1 at 3.) Once up on the roof, agents made contact with two male subjects near the area where the subjects climbed back up. (Doc. No. 7-1 at 3.) The agents continued their search and eventually lifted the cover to the building's vent system, where they discovered four additional subjects inside. (*Id.*)

An agent then spoke with "one of the male subjects," Petitioner, who stated that he

was from Ecuador and did not have entry documents. (*Id.*) Petitioner was "taken into ICE custody without incident at that time." (*Id.*) Once down from the roof and "secured in a safe location," Petitioner was served an I-200 arrest warrant. (*Id.*; Rott Decl. ¶ 20.)

After initial processing, Petitioner was transferred to the Kandiyohi County Jail, where he remains detained. (Petition ¶ 4; Rott Decl. ¶ 21.)

## DISCUSSION

### I. Legal Standard

A writ of habeas corpus may issue where a petitioner is in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). The petitioner bears the burden of establishing, by a preponderance of the evidence, that the challenged detention lacks a lawful basis. *See Aditya W. H. v. Trump*, 782 F. Supp. 3d 691, 703 (D. Minn. 2025) (collecting cases).

Petitioner claims that his detention without a bond hearing violates due process. (Petition ¶¶ 30–45.) He also claims that his warrantless arrest was unlawful because it occurred without probable cause that he was a flight risk. (*Id.* ¶¶ 46–53.) He seeks immediate release or, alternatively, a prompt bond hearing.

Petitioner challenges only the lawfulness of his present detention. He does not contest his removal order, the decision to initiate removal proceedings, or any execution of removal. Thus, jurisdiction lies under 28 U.S.C. § 2241 to review the legal basis for custody. *See, e.g.*, *Mohammed H. v. Trump*, 786 F. Supp. 3d 1149, 1154–55 (D. Minn. 2025). Because the Petition is not directed at removal, statutory channeling provisions do not apply either. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018).

## II. Analysis

### A. Statutory Arrest Authority

Petitioner claims Respondents failed to effectuate a lawful arrest under applicable immigration law. Every federal administrative agency, including ICE, "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). That means any failure to abide by the governing statutes and regulations represents taking action without lawful authority to do so. Accordingly, Petitioner's claim asks whether Respondents acted under the authority conferred to them by Congress.

Federal statutes dictate when it is proper to arrest a noncitizen during the removal process. *See Arizona v. United States*, 567 U.S. 387, 407 (2012). The Immigration and Nationality Act provides two mechanisms for arresting a noncitizen prior to a final removal order. One is to arrest with a warrant under the authority in 8 U.S.C. § 1226(a); the other is to arrest without a warrant under more limited authority in 8 U.S.C. § 1357. *See id.* at 408.

Here, Petitioner was not arrested on a warrant. Respondents' report of the encounter states that Petitioner was taken into custody while still on the roof. (Doc. No. 7-3 at 3.) The record does not show that an I-200 warrant existed at that time. Although Petitioner's I-200 was signed on June 25, 2026, the date of the encounter, it does not include a time. (*See* Doc. No. 7-2.) Its probable cause determination is based in part on the statements Petitioner made to agents on the roof, which indicates that the warrant was not issued until after that point. (*Id.*) The warrant was served on Petitioner

after he was taken down from the roof and "secured and in a safe location." (Doc. No. 7-3 at 3; Rott Decl. ¶ 20.) On this record, Petitioner's arrest was conducted on the roof without proof that a warrant had been issued. Therefore, the warrantless arrest requirements under § 1357 control.

A warrantless arrest may occur only when an officer has reason to believe that a noncitizen is present in violation of immigration law and likely to escape before a warrant can be obtained. 8 U.S.C. § 1357(a)(2). The phrase "reason to believe" has been interpreted to mean constitutionally required probable cause. *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010). And "likely to escape" means likely to disappear before officers can obtain a warrant or likely to evade detention altogether, not just whether the noncitizen would remain at the scene of the encounter, as Respondents contend. *See Campos v. United States*, 888 F.3d 724, 734–35 (5th Cir. 2018) (stating the phrase means likely to "disappear before a warrant could be obtained"); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1006–07 (N.D. Ill. 2016) (construing the phrase as meaning "likely to evade detention by immigration officers"); *see also A.P.P. v. Blanche*, Civ. No. 26-3125 (LMP/LIB), 2026 WL 2017765, at *3 (D. Minn. July 13, 2026) (collecting cases that construe the meaning of "likely to escape").

The question under "likely to escape" is whether immigration officers would have trouble finding the noncitizen again once they obtain a warrant. *See United States v. Bautisa-Ramos*, No. 18-cr-4066-LTS, 2018 WL 5726236, at *7 (N.D. Iowa Oct. 15, 2018), *R&R adopted*, 2018 WL 5723948 (N.D. Iowa Nov. 1, 2018). The analysis therefore considers whether the noncitizen could be found later at another clearly

identifiable location, like their home or place of employment. *See, e.g.*, *Escobar Molina v. U.S. Dep't of Homeland Sec.*, Civ. No. 25-3417 (BAH), 2026 WL 1256234, at *11 (D.D.C. May 7, 2026). ICE itself has given the "likely to escape" phrase this meaning. *See Hussen v. Noem*, Civ. No. 26-324 (ECT/ECW), Doc. No. 85-1 (D. Minn. Jan. 30, 2026) (attaching a January 2026 memorandum from former ICE Acting Director Todd Lyons stating that "likely to escape" means likely "to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained").

Removability alone does not make a noncitizen likely to escape. *See Moreno*, 213 F. Supp. 3d at 1007 (recognizing that equating potential removability with escape risk renders § 1357(a)(2) meaningless); *see also Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945–46 (D. Minn. 2017) (concluding that reason to believe a noncitizen was subject to removal did not show likelihood of escape). The analysis implicates various considerations. Prior enforcement encounters, conflicting documents, and previous removals from the country weigh in favor, while lengthy residence in the country and strong community ties weigh against a person being likely to escape. *See Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 30–31 (D.D.C. 2025) (collecting cases to discuss factors that weigh for and against likelihood of escape).

Respondents argue that Petitioner's warrantless arrest claim fails because they objectively had a reasonable, articulable suspicion that Petitioner was both present in violation of immigration law and likely to escape before a warrant could be obtained. Specifically, they argue that Petitioner admitted he lacked documentation authorizing

entry, and that he was actively trying to escape at the time of arrest. (Doc. No. 6 at 28.) Alternatively, Respondents argue that § 1357(a)(5) justifies the arrest because Petitioner attempted to avoid detection in violation of 8 U.S.C. § 1325(a)(2) (prohibiting noncitizens from eluding examination or inspection by immigration officers). (*Id.* at 29.) Each argument is taken in turn.

Respondents assert that "Petitioner and his crew were hiding in air vents." (Doc. No. 6 at 28.) However, the declaration paragraph they cite in support states, "Once on the roof, ICE/ERO located individuals hiding in the venting system of the building." (Doc. No. 7 at ¶ 19.) Petitioner is not named or otherwise identified as part of that group.

The encounter report itself is not any more specific. It does not specify whether Petitioner was one of the two male subjects encountered on a different part of the roof, or one of the four other subjects discovered in the vents. (*See* Doc. No. 7-3 at 2–3.)

The only facts specific to Petitioner in the report are that the agents learned the minivan was registered in his name, they discovered he had a removal order, and Petitioner told the agents he did not have legal documentation. The record does not identify Petitioner as one of the "numerous subjects" who huddled in the alley, pulled up the ladder, or was found in the ventilation system. None of the acts Respondents point to as their basis for escape risk are clearly attributed to Petitioner. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (recognizing that probable cause must be particularized to the person searched or seized).

The same lack of detail permeates Respondents' claim that Petitioner violated 8 U.S.C. § 1325(a)(2), eluding inspection by immigration officers. His mere presence on

the roof cannot establish a violation. Nothing in the record shows that Petitioner took any specific action to elude the ICE agents. It does show, however, that he told the agents that he lacked documentation when they spoke with him.

At the time of arrest, Petitioner was working on the roof of a law enforcement building. ICE agents, who knew his name and were aware of his removal order, awaited on the ground below. This scenario does not establish probable cause that he was likely to escape that encounter before the agents could have obtained an administrative warrant.

The record also shows Petitioner was locatable even after the encounter. His minivan was registered in his name, he had an active removal proceeding with a recent removal order and pending appeal, he maintained steady employment on a work authorization, and he lived at an established address with his family in Minneapolis. The arresting agents may not have known all these facts. But the record does not show that they took the time to ask. Probable cause requires a particularized assessment of Petitioner's escape risk. *See Orellana*, 230 F. Supp. 3d at 946 (finding an immigration detainer does not represent an assessment of escape risk for purposes of § 1357(a)(2) compliance). Here, Respondents could have ascertained how to locate Petitioner again after the encounter, whether at home or at work. Under the circumstances, it was not objectively reasonable to believe that Petitioner was likely to escape.

Finally, Respondents point to their compliance with 8 C.F.R. § 287.3, which generally provides for a post-arrest examination, a determination about removal proceedings, notification of the reasons for detention, and a custody determination within 48 hours of a warrantless arrest. But that regulation does not provide that serving an I-200

warrant or complying with any of its provisions cures an otherwise invalid warrantless arrest. Compliance with those post-arrest procedures does not supply the statutory authority that § 1357(a)(2) required at the time of the warrantless arrest.

On this record, Respondents lacked probable cause to conclude that Petitioner was likely to escape when they arrested him without a warrant. Accordingly, Petitioner's warrantless arrest violated 8 U.S.C. § 1357.

### B. Remedy

The remaining question is the consequence of the unlawful arrest. Respondents contend that, whatever defect attended the arrest, Petitioner is now properly subject to mandatory detention under § 1225(b)(2)(A). But as explained below, § 1225 supplies no arrest authority and cannot sustain the same uninterrupted custody that began through an arrest unauthorized by § 1357. The Eighth Circuit has not resolved that precise interaction between the two provisions.

#### 1. Release preserves the statutory text and structure

Under *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026), a noncitizen in Petitioner's circumstances falls within § 1225(b)(2)(A) and, after the determination prescribed there, is subject to mandatory detention during removal proceedings. *Avila* did not decide the source or limits of the Government's authority to make a warrantless interior arrest. Thus, accepting that § 1225(b)(2)(A) applies to Petitioner does not answer whether Respondents may continue custody obtained through an arrest that violated § 1357(a)(2).

The Eighth Circuit has not squarely addressed this issue, and courts confronting related questions are divided. Some have denied release where another statutory basis for

detention exists. *See, e.g.*, *Singh v. Sommer*, No. 7:26-cv-5013, 2026 WL 2042296, at *2–3 (D. Neb. July 15, 2026); *Cabrera v. Hidalgo*, No. 1:26-cv-1101 (LMB/LRV), 2026 WL 2002085, at *3 (E.D. Va. June 18, 2026); *A.P.A. v. Arteta*, No. 26-CV-3334 (AS), 2026 WL 1587452, at *3–4 (S.D.N.Y. June 3, 2026). Others have ordered release after finding that the Government lacked statutory authority for the arrest. *See, e.g.*, *Juan J.M.E. v. Easterwood*, Civ. No. 26-2270 (KMM/EMB), 2026 WL 1746672, at *2–3 (D. Minn. June 8, 2026), *R&R adopted*, 2026 WL 1747756 (D. Minn. June 17, 2026); *Alberto Perdomo Rivera v. Mullin*, No. 5:26-cv-04197-KES, 2026 WL 2276935, at *3 & n.1 (C.D. Cal. Aug. 6, 2026).

The statutory text itself marks the analytical starting point. Related statutory provisions should be read where possible so that each retains operative effect. *See Corley v. United States*, 556 U.S. 303, 314 (2009); *Morton v. Mancari*, 417 U.S. 535, 551 (1974). An additional central rule of construction applies: where a specific provision addresses the particular governmental authority at issue, it ordinarily governs over a more general provision that might otherwise be read to reach the same subject. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) (quoting *Morton*, 417 U.S. at 550–51).

Applying those principles to §§ 1357 and 1225 serves to harmonize their distinct but complementary purposes. Section 1357(a)(2) specifically governs the authority exercised here—the power to arrest a noncitizen without a warrant—and it conditions exercise of that authority on finding reason to believe both that the person is unlawfully present and that the person is likely to escape before a warrant can be obtained. Section

1225(b)(2)(A), by contrast, addresses what follows after inspection of an applicant for admission: if an examining immigration officer determines that an applicant is "not clearly and beyond a doubt entitled to be admitted," the applicant "shall be detained" for a removal proceeding under § 1229a. That provision says nothing about warrantless arrest authority.

Reading § 1225 to sustain Petitioner's current detention despite an arrest that § 1357 did not authorize would substantially diminish the limits Congress placed on warrantless arrests. Section 1357 permits such an arrest only when its specified conditions are met. Yet under Respondents' reading, ICE could arrest a noncitizen and even wholly ignore § 1357's conditions, conduct the § 1225 inspection made possible by that arrest, and then continue the same custody because § 1225 requires detention. In every case in which § 1225 ultimately applies, the limitations Congress placed on the warrantless arrest that produced the detention would have no effect on whether that detention could continue. ICE identifies no statutory authority permitting it to bypass § 1357's conditions when making a warrantless arrest or to carve out an exception of its own creation.

The two provisions can instead be given full effect according to the different subjects they address. Section 1357 governs whether ICE may take an interior noncitizen into custody without a warrant. Section 1225(b)(2)(A) addresses what follows after examination: if an examining immigration officer determines that an applicant for admission is "not clearly and beyond a doubt entitled to be admitted," the applicant "shall be detained" for removal proceedings. *Avila* requires enforcement of that detention

command, but it does not hold that § 1225 supplies authority for the warrantless arrest that precedes it. Giving effect to § 1357's specific limits on that arrest therefore does not diminish § 1225 or conflict with *Avila*; it gives effect to both statutes as written.

That reading also fits the statutory sequence. Section 1357(a)(2) directs that a person arrested without a warrant be taken without unnecessary delay before an officer authorized to examine the person's right to enter or remain in the United States. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.3(a). An examination following arrest may supply the determination relevant to § 1225(b)(2)(A), but the later examination does not supply the distinct authority needed for the earlier warrantless seizure.

The question, then, is not whether § 1225 "cures" the defective arrest. It does not make the arrest lawful. The question is whether § 1225 independently authorizes continuation of the same custody even though the Government lacked statutory authority to initiate that custody through the warrantless arrest it chose to make. The statutory text provides no basis for treating the post-arrest detention directive as an independent authorization for custody obtained through an arrest Congress expressly limited in § 1357.

This conclusion does not treat Petitioner's current confinement as "poisonous fruit" or hold that every antecedent statutory violation necessarily invalidates later custody. It rests on the narrower relationship between these provisions. Respondents used the warrantless-arrest authority supplied by § 1357 to take Petitioner into custody, and § 1225 contains no independent grant of arrest authority. The later § 1225 determination may remain valid for the purposes that provision serves, but it does not retrospectively

supply the authority that was absent when this custody began.

Accordingly, § 1225(b)(2)(A) does not independently sustain the present, uninterrupted custody that began with an arrest unauthorized by § 1357(a)(2).

### 2. *Bilokumsky* and later proceedings

*United States ex rel. Bilokumsky v. Tod* states that if "sufficient ground" for a prisoner's detention is shown, the prisoner "is not to be discharged for defects in the original arrest or commitment." 263 U.S. 149, 158 (1923) (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 662 (1892)).

That principle cannot be given short shrift because of the case's age. The Supreme Court later cited the same page of *Bilokumsky* in *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1040 (1984), when explaining that an unlawful arrest does not itself invalidate a subsequent deportation proceeding.[1]

The *Bilokumsky* principle, however, does not resolve this case. *Bilokumsky* establishes that an unlawful original arrest does not invariably require habeas release when sufficient lawful grounds for detention subsequently exist. The unresolved question here is whether § 1225(b)(2)(A) supplies that "sufficient ground" where Petitioner remains in the same custody acquired through an interior warrantless arrest for which § 1357 specifically supplied—and limited—the Government's authority.

The statutory scheme here answers that narrower question. Section 1225 may

---

[1] Respondents also point out that the Supreme Court has "never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant." *Gerstein v. Pugh*, 420 U.S. 103, 113 (1975). But Petitioner's arrest was not supported by probable cause, as explained above.

require detention after the prescribed examination and determination, but § 1225 says nothing about the authority by which custody is acquired in the first instance. Section 1357 expressly governs that antecedent step: it authorizes ICE to take an interior noncitizen into custody without a warrant only when its statutory conditions are satisfied, and then directs that the person be brought before an examining officer. 8 U.S.C. § 1357(a)(2). The examination contemplated by § 1225 may determine whether detention is required, but it does not provide a separate basis for maintaining the same uninterrupted custody when the statutory authority required to initiate that custody was absent. That is why § 1225 is not the "sufficient ground" contemplated by *Bilokumsky* on the facts presented here.

Nor does release invalidate or alter Petitioner's removal proceeding. *Lopez-Mendoza* teaches that the legality of an arrest does not itself determine removability and that an unlawful arrest does not necessarily invalidate the ensuing immigration proceeding. 468 U.S. at 1039–40. Petitioner does not ask to terminate the removal case, suppress evidence in it, or otherwise alter the merits of the removability inquiry. That proceeding may continue notwithstanding the relief ordered here.

The distinction is therefore between the Government's authority to pursue removal and its authority to maintain Petitioner's present physical custody. The former is unaffected. The latter depends on the statutes governing arrest and detention, read together according to their distinct functions. Because § 1357 did not authorize the warrantless arrest through which Respondents acquired custody, and § 1225 does not independently authorize continuation of that custody, Petitioner is entitled to release.

### 3. Conclusion

The appropriate habeas remedy is release from the present custody. *See* 28 U.S.C. §§ 2241(c)(3), 2243; *Munaf v. Geren*, 553 U.S. 674, 693 (2008). That relief is narrow. It terminates the detention initiated through an arrest unauthorized under the provision Congress specifically enacted to govern the seizure at issue. It does not invalidate § 1225, terminate the removal proceedings, or preclude Respondents from later arresting or detaining Petitioner pursuant to lawful authority and in compliance with applicable statutory and regulatory requirements.

Accordingly, the Petition for Writ of Habeas Corpus is granted in part, and Respondents are ordered to immediately release Petitioner.

Petitioner's other habeas claims are not reached, and this Order expresses no position on their merits.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this case, **IT IS HEREBY ORDERED** that:

1. Petitioner Carlos F.P.P.'s Petition for Writ of Habeas Corpus (Doc. No. 1) is **GRANTED IN PART**.

2. Respondents must immediately release Petitioner from custody.

3. When Petitioner is released:

   a. **Release and Return of Property.** When Respondents release Petitioner, he must be released in Minnesota. At the time of Petitioner's release, Respondents shall return to Petitioner all personal property in Respondents' custody or control, including but not limited to, passports, identity papers or licenses, immigration records, prescribed medications,

and treatment-related equipment. Release may not be delayed for any reason related to the retrieval, processing, or return of such property. Any delay or failure to effectuate release in accordance with this paragraph constitutes noncompliance with this Order.

b. **Return to Minnesota.** If Petitioner is currently held outside Minnesota, Respondents shall initiate Petitioner's return to Minnesota for the sole purpose of effectuating release. Respondents shall not delay initiating Petitioner's return based on administrative convenience, transportation availability, or detention-capacity considerations.

c. **Weather-Related Delay.** If weather conditions present a safety risk at the time of release, Respondents may delay physical release only for the brief period necessary to ensure safe release. Any such delay must be strictly limited and may not be used to justify continued custody where a safe alternative is available.

d. **No Recharacterization of Custody.** Respondents may not administratively recharacterize the release granted by this Order as grounds to impose conditions or re-impose existing conditions in conjunction with release (including release on recognizance or similar instruments), without prior notice to and authorization from the Court, or absent a new and independently lawful custody decision properly executed under the law. For the avoidance of doubt, Respondents' compliance with this Order would require Petitioner's release in Minnesota without any newly issued instrument that either imposes new conditions of supervision or restraint or restates previously imposed conditions. Any such conditions imposed at the time of Petitioner's release shall be considered null and void as inconsistent with this paragraph.

4. **Notice.** Within **48 hours** of entry of this Order, Respondents shall file a status update confirming the time, date, and location of Petitioner's release.

5. Petitioner's other claims are not reached.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: September 21, 2026
Time: 5:30 p.m.

*s/ Jerry W. Blackwell*
JERRY W. BLACKWELL
United States District Judge